IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.   1:18-cv-01667

AARON GOODMAN,

     Plaintiff,

v.

ASSET ACCEPTANCE, LLC, and ENCORE CAPITAL GROUP, INC.

     Defendants.

---

## CLASS ACTION COMPLAINT

NOW COMES Plaintiff AARON GOODMAN ("Plaintiff"), by and through his attorneys James C. Vlahakis and Omar T. Sulaiman, and against Defendants ASSET ACCEPTANCE, LLC ("Asset") and ENCORE CAPITAL GROUP, INC. ("Encore") (at times "Defendants") asserts the following putative Class Action Complaint pursuant to Federal Rule of Civil Procedure ("FRCP") 23(a), 23(b)(2) and 23(b)(3) to remedy Defendants' violations of the Fair Debt Collection Practices Act, 15 U.S.C. §1692, et seq. ("FDCPA") and in support asserts the following:

### INTRODUCTION

1.     This action arises under, and is brought pursuant to, the FDCPA.

2.     Subject matter jurisdiction is conferred upon this Court by 15 U.S.C. §1692k, 28 U.S.C. §§ 1331, 1337, as this action arises under the laws of the United States.

3.     Plaintiff is a resident of the State of Colorado.

4.     Plaintiff resides in this District.

5.     Plaintiff brings this class action pursuant to the FDCPA to redress false and deceptive statements contained in a Collection Letter dated June 1, 2018, that was sent by Asset to a Colorado address associated with Plaintiff in an attempt collect an alleged debt purportedly owned by one or both of the Defendants.

6.     A true and correct copy of the June 1, 2018 collection letter ("Collection Letter") is attached as Exhibit A.

7.     As discussed below, the following quoted portion of the Collection Letter violates Sections 1692e(2) and e(10) of the FDCPA:  "The law limits how long you can be sued on a debt. Because of the age of your debt, we will not sue you for it . . . ."

8.     The Collection Letter violates Section 1692e(2) of the FDCPA because the quoted language chosen by one or both of the Defendants falsely represents the character and legal status of the Subject Debt.

9.     The Collection Letter falsely represents the character and legal status of the Subject Debt because the quoted language does not contain a *truthful* representation regarding the character and legal status of the Subject Debt.

10.     On its face, the above quoted language of the Collection Letter is misleading or confusing on its face.

11.     When Asset sent Plaintiff the Collection Letter, the six-year statute of limitations on any debt collection action under Colorado had expired.  *See* CO Rev Stat § 13-80-103.5 (2016).

12.     Accordingly, when Asset sent Plaintiff the Collection Letter, Plaintiff bore no legal responsibility to pay that stale debt and could face no legal jeopardy whatsoever if he refused to pay it.

2

13.    However, if Plaintiff had made just a partial payment to repay that debt, unbeknownst to him, he could have revived the statute of limitations and subjected himself to the debt obligation anew.  *Drake v. Tyner*, 914 P.2d 519, 522 (Colo. App. 1996) ("partial payment alone tolls the statute of limitations" and is a "voluntary acknowledgment of the debt from which the law implies a new promise to pay the balance.").

14.    Similarly, if Plaintiff had even promised made to make a partial payment to repay that debt, unbeknownst to him, he could have revived the statute of limitations and subjected himself to the debt obligation anew.  *Drake*, 914 P.2d at 522 ("under certain circumstances, a new promise to pay a debt, an unqualified acknowledgment of a debt from which a promise to pay may be implied, or a part payment of a debt will start the limitations period running anew.").

15.    Plaintiff could have revived the expired statute of limitations and subjected himself to the debt obligation anew under either of these scenarios because the Collection Letter does not explain that Asset "cannot" sue him for the debt under Colorado law because of the age of the debt.

16.    A *truthful* representation regarding the character and legal status of the Subject Debt would say "[b]ecause of the age of your debt, *we cannot* sue you for it." (Emphasis supplied).

17.    The Collection Letter violates Section 1692e(10) of the FDCPA because the quoted language chosen by one or both of the Defendants is a deceptive communication.

18.    The Collection Letter is a deceptive communication because the letter does not contain an accurate and truthful explanation regarding the age of the debt.

19.    A truthful explanation regarding the age of the debt should say - "[b]ecause of the age of your debt, *we cannot* sue you for it." (Emphasis supplied).

3

20.     As discussed below, Encore's stated business purpose, and that of its subsidiary, Asset, is to purchase and collect time-barred debt.

21.     As reflected below, with eyes' wide open, Defendants sent out hundreds (and possibly thousands) of similarly worded letters to Colorado residents where the purpose of the use of the phrase "we *will not* sue you for it",  was utilized to cause debtors to pay down otherwise time-barred debt, rather than tell debtors the truth, which is that "we *cannot* sue you for it."

22.      As reflected below, the phrasing of the collection letters in this deceptive, misleading and false manner likely caused at least 40, and possibly, thousands of residents of Colorado to pay monies to Defendants where these persons had no legal obligation to pay the time-barred debts.

23.     This Court should require Defendants to disgorged and return any amounts that were paid to Defendants by virtue of the fact that Defendants utilized language to hide from residents of Colorado that their debts were time-barred.

**JURISDICTION, PARTIES AND VENUE**

24.     As discussed below The June 1, 2018, Collection Letter was sent by Asset on behalf of Encore to residential address which is within this District.

25.     Plaintiff is a "consumer" as defined by the FDCPA. *See* 15 U.S.C. 1692a(3).

26.     Asset is incorporated in the State of Delaware and its principal place of business is located at 320 East Big Beaver Road, STE 300, Troy, Michigan 48083.

27.     Asset's registered agent in Colorado is Corporation Service Company located at 1900 West Littleton Boulevard, Littleton, Colorado 80120.

28.    Encore is a Delaware Corporation with headquarters located at 3111 Camino Del Rio N., Suite 103, San Diego, California 92108.

29.    Encore's registered agent is Corporation Service Company located at 251 Little Falls Drive, Wilmington, Delaware 19808.

30.    Asset is a subsidiary of Encore.

31.    Encore's SEC 10-K filing for the year ending December 31, 2017, explains its acquisition of Asset as follows:

> In June 2013, we completed our merger with Asset Acceptance Capital Corp. ("AACC"), another leading provider of debt recovery solutions in the United States. In January 2012, Asset Acceptance, LLC, a subsidiary of AACC, entered into a consent decree with the FTC. The consent decree ended an FTC investigation into Asset Acceptance, LLC's compliance with the FTCA, FDCPA, and FCRA. As part of the consent decree, Asset Acceptance, LLC agreed to undertake certain consumer protection practices, including, among other things, furnishing additional disclosures to consumers when collecting debt past the statute of limitations, and paid a civil penalty of $2,500,000. These practices continue to apply to the portfolios we purchased as a result of the merger with AACC. We do not expect compliance with the consent decree to have a material effect on our business.[1]

32.    Encore's SEC 10-K filing for the year ending December 31, 2017, is hosted at

http://services.corporate-ir.net/SEC.Enhanced/SecCapsule.aspx?c=115920&fid=15468248

33.    Asset collects consumer debts as a subsidiary of Encore.

34.    Encore purchases and own debts purportedly owed by consumers who reside in the State of Colorado.

35.    Asset has mailed collection letter to residents in the State of Colorado in an effort to collect consumer debts purchased and owned by Encore.

---

[1] *See* Encore's SEC 10-K filing for the year ending December 31, 2017, p. 11.

36.    Because Asset collects consumer debts and it is a subsidiary of Encore, Encore's primary business purpose is the collection of defaulted debts.

37.    Asset conducts business in the District of Colorado through its transmission of debt collection letters to residents in the State of Colorado.

38.    Asset conducts substantial business in the District of Colorado through its transmission of debt collection letters to residents in the State of Colorado.

39.    Encore conducts business in the District of Colorado by utilizing Asset to transmit debt collection letters to residents in the State of Colorado to collect debts owned by Encore or Asset.

40.    Encore conducts substantial business in the District of Colorado by utilizing Asset to transmit debt collection letters to residents in the State of Colorado to collect debts owned by Encore or Asset.

41.    Asset collects consumer debts purportedly owed by consumers who reside in the State of Colorado where Encore or Asset is the owner of the debt.

42.    On a monthly basis, Asset transmits hundreds of debt collection letters to consumers who reside in the State of Colorado where Encore or Asset is the owner of the debt.

43.    On a monthly basis, Asset transmits hundreds of debt collection letters to consumers who reside in the State of Colorado where Encore or Asset is the owner of the debt.

44.    In past twelve (12) months prior to the filing of this lawsuit, Asset caused over 40 debt collection letters (a) to be mailed to consumers who reside in the State of Colorado, (b) where Encore or Asset is the owner of the debt and (c) records maintained by one or more of the

Defendants can demonstrate that the subject debts are beyond the applicable statute of limitations to file lawsuits against the intended recipients of the collection letters.

45.     In past twelve (12) months prior to the filing of this lawsuit, Asset caused over 80 debt collection letters (a) to be mailed to consumers who reside in the State of Colorado, (b) where Encore or Asset is the owner of the debt and (c) records maintained by one or more of the Defendants can demonstrate that the subject debts are beyond the applicable statute of limitations to file lawsuits against the intended recipients of the collection letters.

46.     In past twelve (12) months prior to the filing of this lawsuit, Asset caused over 120 debt collection letters (a) to be mailed to consumers who reside in the State of Colorado, (b) where Encore or Asset is the owner of the debt and (c) records maintained by one or more of the Defendants can demonstrate that the subject debts are beyond the applicable statute of limitations to file lawsuits against the intended recipients of the collection letters.

47.     In past twelve (12) months prior to the filing of this lawsuit, Asset caused over 160 debt collection letters (a) to be mailed to consumers who reside in the State of Colorado, (b) where Encore or Asset is the owner of the debt and (c) records maintained by one or more of the Defendants can demonstrate that the subject debts are beyond the applicable statute of limitations to file lawsuits against the intended recipients of the collection letters.

48.     In past twelve (12) months prior to the filing of this lawsuit, Asset caused over 200 debt collection letters (a) to be mailed to consumers who reside in the State of Colorado, (b) where Encore or Asset is the owner of the debt and (c) records maintained by one or more of the Defendants can demonstrate that the subject debts are beyond the applicable statute of limitations to file lawsuits against the intended recipients of the collection letters.

49.     In past twelve (12) months prior to the filing of this lawsuit, (a) Asset has received at least 80 payments from distinct consumers who reside in the State of Colorado, (b) where Encore or Asset is the owner of the debt, and (c) records maintained by one or more of the Defendants can demonstrate that the subject debts are beyond the applicable statute of limitations to file lawsuits against the intended recipients of the collection letters.

50.     In past twelve (12) months prior to the filing of this lawsuit, (a) Asset has received at least 120 payments from distinct consumers who reside in the State of Colorado, (b) where Encore or Asset is the owner of the debt, and (c) records maintained by one or more of the Defendants can demonstrate that the subject debts are beyond the applicable statute of limitations to file lawsuits against the intended recipients of the collection letters.

51.     In past twelve (12) months prior to the filing of this lawsuit, (a) Asset has received at least 160 payments from distinct consumers who reside in the State of Colorado, (b) where Encore or Asset is the owner of the debt, and (c) records maintained by one or more of the Defendants can demonstrate that the subject debts are beyond the applicable statute of limitations to file lawsuits against the intended recipients of the collection letters.

52.     In past twelve (12) months prior to the filing of this lawsuit, (a) Asset has received at least 200 payments from distinct consumers who reside in the State of Colorado, (b) where Encore or Asset is the owner of the debt, and (c) records maintained by one or more of the Defendants can demonstrate that the subject debts are beyond the applicable statute of limitations to file lawsuits against the intended recipients of the collection letters.

53.     In past twelve (12) months prior to the filing of this lawsuit, (a) Asset has received at least 40 payments from distinct consumers who reside in the State of Colorado, (b) where Encore

or Asset is the owner of the debt, and (c) records maintained by one or more of the Defendants can demonstrate that the subject debts are beyond the applicable statute of limitations to file lawsuits against the intended recipients of the collection letters.

54.     Asset and/or Encore have received payments from residents in this District in relation to debt collection efforts directed toward residents in this state.

55.     Venue is proper Court pursuant to 28 U.S.C. §1391 because of one or more the events or omissions giving rise to the claim occurred within the District of Colorado.

## SUMMARY OF THIS CIVIL ACTION

56.     Asset has received payments from residents in the State of Colorado in response to collection letters that Asset sent to residents in the State of Colorado for consumer debts purchased and owned by Encore or Asset.

57.     Asset has mailed collection letter to residents in the State of Colorado in an effort to collect consumer debts purchased and owned by Encore or Asset where Asset knew at the time that it mailed that letters that the debts were past the time period for which a lawsuit could be lawfully initiated to collect the debts.

58.     Asset has received payments from residents in the State of Colorado in response to collection letters that Asset sent to residents in the State of Colorado for consumer debts purchased and owned by Encore where Asset knew at the time that it received the payments that the debts were past the time period for which a lawsuit could be lawfully initiated to collect the debts.

59.    When Asset has mailed collection letter to debtors who resided in the State of Colorado in an effort to collect consumer debts purchased and owned by Encore and Asset knew at the time that it mailed the collection letters that the debts were past the time period for which a lawsuit could be lawfully initiated to collect the debts, Asset's collection letters did not state that Asset could not sue the debtors because the debts were past the time period for which a lawsuit could be lawfully initiated to collect the debts.

60.    When asset has received payments from residents in the State of Colorado in response to collection letters that Asset sent to residents in the State of Colorado for consumer debts purchased and owned by Encore and Asset knew at the time that it received the payments that the debts were past the time period for which a lawsuit could be lawfully initiated to collect the debts, Asset's collection letters which mailed out before a payment was received did not state that Asset could not sue the debtors because the debts were past the time period for which a lawsuit could be lawfully initiated to collect the debts.

61.    Individually, and collectively, Defendants buy and service delinquent consumer debts for others, including a debt allegedly owed by Plaintiff.

**ENCORE'S STATEMENTS IN ITS MOST RECENT SEC 10-K FILING RELATED TO THE NATURE OF ITS BUSINESS, ITS DESCRIPTION OF CERTAIN LEGAL PROCEEDINGS, ITS COMPLIANCES PRACTICES AND THE IMPACT OF LITIGATION ON ITS BOTTOM LINE**

62.    Encore's SEC 10-K filing for the year ending December 31, 2017, explains that it "purchase[s] portfolios of defaulted consumer receivables at deep discounts to face value":

> ***Nature of Our Business***
>
> We are an international specialty finance company providing debt recovery solutions and other related services for consumers across a broad range of financial assets. We purchase portfolios of defaulted consumer

10

receivables at deep discounts to face value and manage them by working with individuals as they repay their obligations and work toward financial recovery. Defaulted receivables are consumers' unpaid financial commitments to credit originators, including banks, credit unions, consumer finance companies, commercial retailers, and telecommunication companies. Defaulted receivables may also include receivables subject to bankruptcy proceedings.

We are a market leader in portfolio purchasing and recovery in the United States, including Puerto Rico.[2]

63. Encore's SEC 10-K filing for the year ending December 31, 2017, describes it

"*Legal, Compliance and Enterprise Risk Management, Oversight*" in the United States as follows:

Our legal and compliance oversight functions are divided between our legal, compliance and enterprise risk management departments. Our legal department manages regulatory oversight, litigation, corporate transactions, and compliance with our internal ethics policy, while our compliance department tests and monitors adherence to State and Federal regulations and enterprise risk management manages risk and internal audit.

The legal department is responsible for interpreting and administering our Standards of Business Conduct (the "Standards"), which apply to all of our directors, officers, and employees and outlines our commitment to a culture of professionalism and ethical behavior. The Standards promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, compliance with applicable laws, rules and regulations, and full and fair disclosure in reports that we file with, or submit to, the SEC and in other public communications made by us. As described in the Standards, we have also established a toll-free Compliance Hotline to allow directors, officers, and employees to report any detected or suspected fraud, misappropriations, or other fiscal irregularities, any good faith concern about our accounting and/or auditing practices, or any other violations of the Standards.

We continually monitor applicable changes to laws governing statutes of limitations and disclosures to consumers. We maintain policies, system controls, and processes designed to ensure that accounts past the applicable statute of limitations do not get placed into legal collections. Additionally, in written and verbal communications with

---

[2] *Id*. at p. 1.

consumers, we provide disclosures to the consumer that the account is past its applicable statute of limitations and, therefore, we will not pursue collections through legal means.

The compliance department is responsible for promoting compliance with applicable laws and regulations. The compliance department facilitates oversight by our Board of Directors and management, assists in formulating policies and procedures, and engages in training, risk assessments, testing, monitoring and corrective action, complaint response, and compliance audits.

The enterprise risk management department is responsible for the development and administration of internal policies, procedures, periodic risk assessments and controls which apply to all of our business units and for performing internal audits to evaluate the level of compliance to both regulations, such as Sarbanes-Oxley 404, and standards of internal control for internal operations.[3]

64.    Encore's SEC 10-K filing for the year ending December 31, 2017, states that it maintains "written policies", "company-wide best practices" as well as "strict policies and a code of ethics, which guide all dealings with our consumers."[4]

65.    According to Encore's SEC 10-K filing for the year ending December 31, 2017:

Beyond written policies, one of our core internal goals is the adherence to principled intent as it pertains to all consumer interactions. We believe that it is in our shareholders' and our employees' best interest to treat all consumers with the highest standards of integrity. Specifically, we have strict policies and a code of ethics, which guide all dealings with our consumers. To reinforce existing written policies, we have established a number of quality assurance procedures. Through our Quality Assurance program, our Fair Debt Collection Practices Act training for new account managers, our Fair Debt Collection Practices Act recertification program for continuing account managers, and our Consumer Support Services department, we take significant steps to ensure compliance with applicable laws and regulations and seek to promote consumer satisfaction. Our Quality Assurance team aims to enhance the skills of account managers and

---

[3] *Id.* at p. 7.

[4] *Id.* at p. 7.

to drive compliance initiatives through active call monitoring, account manager coaching and mentoring, and the tracking and distribution of company-wide best practices. Finally, our Consumer Support Services department works directly with consumers to seek to resolve incoming consumer inquiries and to respond to consumer disputes as they may arise.[5]

66.    Encore's SEC 10-K filing for the year ending December 31, 2017, recognizes that it is subject to "Government Regulation."

67.    According to Encore's SEC 10-K filing for the year ending December 31, 2017:

> Our debt purchasing and collection activities are subject to federal, state, and municipal statutes, rules, regulations, and ordinances that establish specific guidelines and procedures that debt purchasers and collectors must follow when collecting consumer accounts. It is our policy to comply with the provisions of all applicable laws in all of our recovery activities. Our failure to comply with these laws could have a material adverse effect on us to the extent that they limit our recovery activities or subject us to fines or penalties in connection with such activities.
>
> The federal Fair Debt Collection Practices Act ("FDCPA") and comparable state and local laws establish specific guidelines and procedures that debt collectors must follow when communicating with consumers, including the time, place and manner of the communications, and prohibit unfair, deceptive, or abusive debt collection practices. Until 2011, the Federal Trade Commission ("FTC") administered, and had primary responsibility for the enforcement of, the FDCPA.[6]

68.    Encore's SEC 10-K filing for the year ending December 31, 2017, recognizes that it entered into a consent order with the CFPB covering a five year time period:

> On September 9, 2015, we entered into a consent order (the "Consent Order") with the CFPB in which we settled allegations arising from our practices between 2011 and 2015. The Consent Order includes obligations on us to, among other things: (1) follow certain specified operational requirements, substantially all of which are already part of our

---

[5] *Id.* at pp. 7-8.

[6] *Id.* at pp. 7-8.

current operations; (2) submit to the CFPB for review a comprehensive plan designed to ensure that our debt collection practices comply with all applicable federal consumer financial laws and the terms of the Consent Order; (3) pay redress to certain specified groups of consumers; and (4) pay a civil monetary penalty.[7]

69.    Encore's SEC 10-K filing for the year ending December 31, 2017, stated that "[w]e will continue to cooperate and engage with the CFPB and work to ensure compliance with the Consent Order." *Id*. at p. 11.

70.    Encore's SEC 10-K filing for the year ending December 31, 2017, also "we are subject to ancillary state attorney general investigations related to similar debt collection practices." *Id*. at p. 11.

71.    Encore's SEC 10-K filing for the year ending December 31, 2017, in discussing "[t]he CFPB's enforcement activity" states that there is an "absence of clear rules or regulatory expectations." *Id*.

72.    Encore's SEC 10-K filing for the year ending December 31, 2017, states that the "absence of clear rules or regulatory expectations" "can be disruptive to third parties as they attempt to define appropriate business practices." *Id*.

73.    Encore's SEC 10-K filing for the year ending December 31, 2017, states that in the "absence of clear rules or regulatory expectations", "certain commercial relationships we maintain may be disrupted or impacted by changes in third-parties' business practices or perceptions of elevated risk relating to the debt collection industry." *Id.*

---

[7] *Id*. at p. 10.

74.     Encore's SEC 10-K filing for the year ending December 31, 2017, recognizes "that court rulings in various jurisdictions may also affect our ability to collect." *Id.*

75.     Encore's SEC 10-K filing for the year ending December 31, 2017, recognizes that "laws and regulations, and others similar to the ones listed above, as well as laws applicable to specific types of debt, impose requirements or restrictions on collection methods or our ability to enforce and recover certain of our receivables"

76.     Encore's SEC 10-K filing for the year ending December 31, 2017, recognizes that "any new or changed laws, rules, or regulations, and reinterpretation of the same, may adversely affect our ability to recover amounts owing with respect to our receivables or the sale of receivables by creditors and resellers." *Id.*

77.     Encore's SEC 10-K filing for the year ending December 31, 2017, recognizes that it is subject to "litigation, including individual and class action lawsuits" and that it "may be subject to awards of substantial damages or be required to make other expenditures or change our business practices as a result." *Id.* at p. 19.

78.     On the topic of lawsuits, Encore's SEC 10-K filing for the year ending December 31, 2017, states that "we operate in an extremely litigious climate." *Id.*

79.     According to Encore's SEC 10-K filing for the year ending December 31, 2017:

> We operate in an extremely litigious climate and currently are, and may in the future be, named as defendants in litigation, including individual and class action lawsuits under consumer credit, consumer protection, theft, privacy, data security, automated dialing equipment, debt collections, and other laws. Many of these cases present novel issues on which there is no clear legal precedent, which increases the difficulty in predicting both the potential outcomes and costs of defending these cases. We are subject to ongoing risks of regulatory investigations, inquiries, litigation, and other actions by the CFPB, FTC, state Attorneys General, or other governmental bodies relating to our activities. These litigation and regulatory actions

involve potential compensatory or punitive damage claims, fines, costs, sanctions, civil monetary penalties, consumer restitution, or injunctive relief, as well as other forms of relief, that could require us to pay damages, make other expenditures or result in changes to our business practices. Any changes to our business practices could result in lower collections, increased cost to collect or reductions in estimated remaining collections. Actual losses incurred by us in connection with judgments or settlements of these matters may be more than our associated reserves. Further, defending lawsuits and responding to governmental inquiries or investigations, regardless of their merit, could be costly and divert management's attention from the operation of our business. All of these factors could have an adverse effect on our business, financial condition and operating results.[8]

80.    Encore's SEC 10-K filing for the year ending December 31, 2017, indicates that it is "subject to awards of substantial damages" resulting from "consumer protection" based "class action lawsuits."

81.    Encore's SEC 10-K filing for the year ending December 31, 2017:

**A significant portion of our collections relies upon our success in individual lawsuits brought against consumers and our ability to collect on judgments in our favor.**

We generate a significant portion of our revenue by collecting on judgments that are granted by courts in lawsuits filed against consumers. A decrease in the willingness of courts to grant these judgments, a change in the requirements for filing these cases or obtaining these judgments, or a decrease in our ability to collect on these judgments could have an adverse effect on our business, financial condition and operating results. As we increase our use of the legal channel for collections, our shortterm margins may decrease as a result of an increase in upfront court costs and costs related to counter claims. We may not be able to collect on certain aged accounts because of applicable statutes of limitations and we may be subject to adverse effects of regulatory changes. Further, courts in certain jurisdictions require that a copy of the account statements or applications be attached to the pleadings in order to obtain a judgment against consumers. If we are unable to produce those account documents, these courts could

---

[8] *Id.* at p. 19.

deny our claims, and our business, financial condition and operating results may be adversely affected.[9]

82.    Encore's SEC 10-K filing for the year ending December 31, 2017, recognizes that debts that it purchases "that do not meet" Encore's "collection criteria" may result in "an adverse effect on our cash flows and our operations." [10]

83.    Under the heading "Commitments and Contingencies Litigation" and the subheading of "*Litigation and Regulatory*", Encore's SEC 10-K filing for the year ending December 31, 2017, explains that it "is [routinely] involved in disputes, legal actions, regulatory investigations, inquiries, and other actions from time to time in the ordinary course of business." [11]

84.    Encore's routine involvement in litigation fully explained by Encore's SEC 10-K filing for the year ending December 31, 2017, which references litigation involving the FDCPA and Encore's specific involvement in legal proceedings involving "attempts to collect debts on which the statute of limitations has run."

85.    According to Encore's SEC 10-K filing for the year ending December 31, 2017:

> The Company, along with others in its industry, is routinely subject to legal actions based on the Fair Debt Collection Practices Act ("FDCPA"), comparable state statutes, the Telephone Consumer Protection Act ("TCPA"), state and federal unfair competition statutes, and common law causes of action. The violations of law investigated or alleged in these actions often include claims that the Company lacks specified licenses to conduct its business, attempts to collect debts on which the statute of limitations has run, has made inaccurate or unsupported assertions of fact

---

[9] *Id*. at p. 15.

[10] *Id*. at p. 15.

[11] *Id*. at p. F-37.

in support of its collection actions and/or has acted improperly in connection
with its efforts to contact consumers. Such litigation and regulatory actions
could involve potential compensatory or punitive damage claims, fines,
sanctions, injunctive relief, or Table of Contents F-38 changes in business
practices. Many continue on for some length of time and involve substantial
investigation, litigation, negotiation, and other expense and effort before a
result is achieved, and during the process the Company often cannot
determine the substance or timing of any eventual outcome.[12]

86.    Encore's SEC 10-K filing for the year ending December 31, 2017, describes its

involvement in legal proceedings brought by the CFBP regarding time-barred or out of statute

debt.

87.    Encore's SEC 10-K filing for the year ending December 31, 2017, described the

CFPB action as follows:

On September 9, 2015, the Company entered into a consent order
(the "Consent Order") with the CFPB in which it settled allegations arising
from its practices between 2011 and 2015. The Consent Order includes
obligations on the Company to, among other things: (1) follow certain
specified operational requirements, substantially all of which are already
part of the Company's current operations; (2) submit to the CFPB for review
a comprehensive plan designed to ensure that its debt collection practices
comply with all applicable federal consumer financial laws and the terms of
the Consent Order; (3) pay redress to certain specified groups of consumers;
and (4) pay a civil monetary penalty. *The Company will continue to
cooperate and engage with the CFPB and work to ensure compliance with
the Consent Order*.[13]

88.    According to Encore's SEC 10-K filing for the year ending December 31, 2017, it

"incurred a $10.0 million civil monetary penalty related to the CFPB settlement." [14]

---

[12] *Id.* at p. F-36.

[13] *Id.* at p. F-37.

[14] *Id.* at p. F-33.

89.    Encore's SEC 10-K filing for the year ending December 31, 2017, indicates that it incurred an "after-tax charge of approximately $43 million in the third quarter of 2015 as a result of the CFPB action.[15]

90.    Encore's SEC 10-K filing for the year ending December 31, 2017, states that this after-tax charge of approximately $43 million "will cover all related impacts of the Consent Order, including civil monetary penalties, restitution, any such ancillary state regulatory matters, legal expenses and portfolio allowance charges on several pool groups due to the impact on the Company's current estimated remaining collections related to its existing receivable portfolios."[16]

91.    But according to Encore's SEC 10-K filing for the year ending December 31, 2017, it "anticipates that after this one-time charge, any future earnings impact will be immaterial."[17]

92.    Encore's SEC 10-K filing for the year ending December 31, 2017, also states that "[i]n certain legal proceedings, [Encore] may have recourse to insurance or third party contractual indemnities to cover all or portions of its litigation expenses, judgments, or settlements."[18]

93.    Encore's SEC 10-K filing for the year ending December 31, 2017, discusses the purchase and collection "statute barred debt."[19]

---

[15] *Id*. at p. F-37.

[16] *Id*. at p. F-37.

[17] *Id*. at p. F-37.

[18] *Id*. at p. F-37.

[19] *Id*. at pp. 1, 17-18 (as quoted in the following Paragraph).

94.     Encore's discussion of this topic is in relation to Encore's discussion of its *international subsidiary* – "Cabot Credit Management plc", which Encore states "is one of the largest credit management services providers in Europe and is a market leader in the United Kingdom and Ireland."[20]

95.     According to Encore's SEC 10-K filing for the year ending December 31, 2017, its collection of "statute barred debt" was explained as follows:

> **Failure to comply with the regulatory regime to which Cabot is subject may adversely affect our business, financial condition and operating results**.
>
> The debt purchase and collections sector and the broader consumer credit industry in the United Kingdom and the other jurisdictions in which Cabot operates is highly regulated under various laws and regulations.
>
> * * *
>
> UK debt purchase and collections businesses are principally regulated by the FCA, the ICO and the OFCOM.
>
> * * *
>
> The FCA regards debt collection as a "high risk" activity and therefore dedicates special resources to more intensive monitoring of businesses in this sector. The FCA Handbook has a specialist consumer credit sourcebook ("CONC") for the consumer credit sector, which includes rules and guidance in relation to, inter alia, the handling of vulnerable customers; communications with customers; arrears, default and recovery of debt; debt advice *and statute barred debt*. While UK debt purchase and collection businesses are principally regulated by the FCA and the provisions of the FSMA, there is additional legislation and regulation that governs consumer credit, including the Consumer Credit Act 1974 (as amended) ("CCA") which imposes various obligations on lenders, and any person who exercises the rights and duties of lenders, including to provide post contract information such as statements of account, notices of sums in arrears and default notices. Any failure to comply with such legislation or regulation could result in FCA action. The FCA and the previous regulator, the UK Office of Fair Trading (the "OFT"), have already taken action

---

[20] *Id*. at pp. 1, 17-18 (as quoted in the following Paragraph).

against, and have imposed requirements on, a number of well known financial institutions, other financial institutions and debt management companies. In addition, Cabot is subject to various regulations concerning consumer protection and data protection, among others, as well as regulations in the other jurisdictions in which it operates.[21]

96.     Encore's SEC 10-K filing for the year ending December 31, 2017, states that it is "subject to awards of substantial damages" resulting from "consumer protection" based "class action lawsuits."

97.     Notwithstanding (a) the above quoted representations Encore's SEC 10-K filing for the year ending December 31, 2017, and (b) the fact that Encore and/or its subsidiaries have been sued at least three times for using the phrase "we will not sue you," Defendants continue to use this wording in dunning letters sent to this state and others.

98.     Defendants use this wording to deceive and mislead debtors regarding the true legal status of time-barred debt.

99.     Defendants use this wording to deceive and mislead debtors from learning that Defendants cannot legally sue them for time-barred debt.

100.    This type of language is "materially misleading."  *See, Pierre v. Midland Credit Management, Inc.*, 16-cv-2895, Memorandum Opinion and Order, Dkt. 105, p. 14 (N.D. Ill. Feb. 5, 2018).  Attached hereto as Exhibit B.

101.    According to the court in *Pierre*:

When Midland sent Pierre the dunning letter in September 2015, the statute of limitations on any debt collection action had passed.  Pierre thus bore no legal responsibility to pay that stale debt and could face no legal jeopardy whatsoever if she refused to pay it. However, under Illinois law, had Pierre made a partial payment or promised to repay that debt, she could have

---

[21] *Id.* at p. F-37.

> revived the statute of limitations and subjected herself to the debt obligation anew. Pierre argues that because the letter failed to warn of this possibility, the letter is misleading as a matter of law. The Court agrees.

*Id*. at p. 8 (citations omitted).

102.    By using the phrase "we will not sue you," Defendants imply that it is a beneficial favor that it is bestowing upon consumers, when in reality, Defendants *cannot sue debtors for time-barred debt.*

103.    By using the phrase "we will not sue you," Defendants know that a certain segment of the population receiving this letter will pay their debt to avoid being sued or as a result of being duped by Defendants' insincerely implying that they are bestowing a benefit upon consumers, when in reality, Defendants *cannot sue debtors for time-barred debt*

104.    "Absent disclosures to consumers as to the age of their debt, the legal enforceability of it, and the consequences of making a payment on it, it is plausible that dunning letters seeking collection on time-barred debts may mislead and deceive unsophisticated consumers." Brief of Amici Curiae Federal Trade Commission and Consumer Financial Protection Bureau at 7, *Delgado v. Capital Management Services, LP*, 2013 WL 1194708 (No. 13-2030).

105.    In reversing dismissal of FDCPA claim involving a collection letter that used the term "settlement offer", the court in *Buchanan v. Northland Group, Inc.*, 776 F.3d 393 (6th Cir. 2015) stated:

> The other problem with the letter is that an unsophisticated debtor who cannot afford the settlement offer might nevertheless assume from the letter that some payment is better than no payment. Not true: Some payment is worse than no payment. The general rule in Michigan is that partial payment restarts the statute-of-limitations clock, giving the creditor a new opportunity to sue for the full debt.

*Id*. at 399.

106.     Similarly, the Court in *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010, 1021 (7th Cir. 2014) addressed a collection letter that offered to "settle" a debt and held:

> The fact that both [ ] letters contained an offer of settlement makes things worse, not better, since a gullible consumer who made a partial payment would inadvertently have reset the limitations period and made herself vulnerable to a suit on the full amount. That is why those offers only reinforced the misleading impression that the debt was legally enforceable.")

*Id*. at 1021.

## ADDITIONAL ALLEGATION RELATED TO THE COLLECTION LETTER

107.     The Subject Debt was for personal goods and services.

108.     Upon information and belief, Encore purchased, and Asset began to collect, the Subject Debt sometime after Plaintiff defaulted on the Subject Debt.

109.     The Collection Letter listed Citibank as the original creditor for the Subject Debt. *Id.*

110.     The Collection Letter offered Plaintiff the option to resolve the Subject Debt for 70% off of the total amount due if payment is received by June 29, 2018.

111.     The Collection Letter further stated, "The law limits how long you can be sued on a debt. Because of the age of your debt, *we will not sue you for it*" (*emphasis added*) *Id.*

112.     The Collection Letter also included a detachable payment coupon instructing Plaintiff to return to Defendant with a payment. *Id.*

113.     The Collection Letter is threatening, deceptive, and misleading on its face.

114.     The Collection Letter's language concerning Asset's refusal to sue could have led and caused Plaintiff to believe that he can be sued if Defendants so choose.

115.    In actively attempting to deceive Plaintiff into paying the Subject Debt, Asset fails to mention to Plaintiff that choosing the repayment option may restart the statute of limitations on the Subject Debt.

116.    The Subject Debt is time-barred.

117.    The statute of limitations period in Colorado for filing suit to collect on the Subject Debt had expired before Encore purchased the "Subject Debt."

118.    The statute of limitations period in Colorado for filing suit to collect on the Subject Debt had expired when the Collection Letter was mailed to Plaintiff.

119.    It is well settled law that repayment on a debt which has expired due to the statute of limitations will be revived through payment by the debtor.

120.    The Collection Letter could have substituted the words "will not" for the word "cannot."

121.    Asset intentionally utilized the word "cannot" in the Collection Letter instead of using the "will not."

122.    Encore intentionally utilized the word "cannot" in the Collection Letter instead of using the "will not."

123.    Encore approved of the word "cannot" in the Collection Letter instead of using the "will not."

124.    On information and belief, in-house legal staff at Asset reviewed the decision to use the word "cannot" in the Collection Letter instead of using the "will not."

125.    On information and belief, in-house legal staff at Asset approved of the decision to use word "cannot" in the Collection Letter instead of using the "will not."

126.    On information and belief, in-house legal staff at Encore reviewed the decision to use the word "cannot" in the Collection Letter instead of using the "will not."

127.    On information and belief, in-house legal staff at Encore approved of the decision to use word "cannot" in the Collection Letter instead of using the "will not."

128.    On information and belief, outside legal counsel for Asset reviewed the decision to use the word "cannot" in the Collection Letter instead of using the "will not."

129.    On information and belief, outside legal counsel for Encore approved of the decision to use word "cannot" in the Collection Letter instead of using the "will not sue."

130.    Despite being sued in other lawsuits involving the use of the words "will not" being used in

131.    The "will not", as opposed to "cannot" language used by Asset in the Collection Letter attempted to coerce Plaintiff into reviving the debt.

132.    Asset attempted to coerce Plaintiff into reviving the debt.

133.    The Collection Letter is calculated to induce either a payment or a response from Plaintiff acknowledging the debt and a promise to pay.

134.    In the event that Plaintiff makes a payment towards the Subject Debt, the clock will restart on the statute of limitations period for collecting upon the Subject Debt. *Drake*, 914 P.2d at 522.

135.    Asset and/or Encore attempted to lure Plaintiff into a trap whereby he will pay towards the time-barred Subject Debt in exchange for a renewed statute of limitations period.

136.    Asset and/or Encore's statements within the Collection Letter are not only deceptive, but baseless, and further add to the state of confusion perpetuated by Defendants' collection practices.

137.    Asset and/or Encore had no reason to believe that Plaintiff would be able to decipher its jumbled language in the Collection Letter, nor reconcile it with the conflicting legal nature of the alleged debt.

138.    Asset and/or Encore's communications are intentionally deceptive and confusing to consumers and are designed induce payment on debts that are time-barred.

139.    Asset and/or Encore's harassment techniques are designed to force unsophisticated consumers, such as Plaintiff, to pay time-barred debts in order avoid further harassment, embarrassment, and sheer annoyance.

140.    Asset and/or Encore attempted to revive their right to sue on the Subject Debt by formulating a scheme to coerce Plaintiff into acknowledging the Subject Debt and reviving the statute of limitations.

141.    Plaintiff has suffered from emotional distress as he believed that he will be sued for a debt for which he cannot be sued.

142.    Plaintiff has incurred costs and expenses consulting with his attorneys as a result of Defendants' conduct.

**COUNT I - VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT**

**(INDIVIDUAL CLAIMS AGAINST DEFENDANTS)**

143.    Plaintiff repeats and realleges all of the above allegations as though fully set forth herein.

144.    Plaintiff is a "consumer" as defined by FDCPA §1692a(3).

145.    The Subject Debt is a "debt" as defined by FDCPA §1692a(5) as it arises out of a transaction for personal, family, or household purposes.

146.    Asset is a "debt collector" as defined by §1692a(6) because it regularly collects debts and uses the mail and/or the telephone to collect delinquent consumer accounts and because its collection activities commenced after the Subject Debt was in default.

147.    Encore is a "debt collector" as defined by §1692a(6) because it regularly collects debts and uses the mail and/or the telephone to collect delinquent consumer accounts and because its collection activities commenced after the Subject Debt was in default.

148.    Asset's primary purpose is the collection of debt as it derives a majority of its revenue from the collection of defaulted consumer receivables and it is thus a "debt collector" as defined in 15 U.S.C. § 1692a(6) of the FDCPA.

149.    Encore's primary purpose is the collection of debt as it derives a majority of its revenue from the collection of defaulted consumer receivables and it is thus a "debt collector" as defined in 15 U.S.C. § 1692a(6) of the FDCPA.

150.    Defendants violated 15 U.S.C. §§ 1692e, 1692e(2) and 1692e(10), through its debt collection efforts.

151.    In particular, it was unfair for Defendants to conceal from Plaintiff that choosing a repayment option would restart the statutory period for bringing suit against him.

152.    Defendants acted with knowledge that its conduct would result in Plaintiff forfeiting protections lawfully afforded to him.

153.    Section 1692e of the FDCPA states that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."

154.    In particular, Section 1692e(2) of the FDCPA prohibits "[t]he false representation of – (A) the character, amount, or legal status of any debt[.]"

155.    In particular, Section 1692e(10) of the FDCPA prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt[.]"

156.    Defendants violated 15 U.S.C. §§ 1692e and 1692e(10) by employing deceptive means to collect the Subject Debt.

157.    Defendants violated 15 U.S.C. §§ 1692e, 1692e(2) and 1692e(10) because the Collection Letter failed to advise Plaintiff that he cannot be sued on the Subject Debt.

158.    Defendants violated 15 U.S.C. §§ 1692e, 1692e(2) and 1692e(10) because the Collection Letter failed to advise Plaintiff that if he made payment that payment would restart the expired statute of limitations for the Subject Debt.

159.    The language of the letter and failing to advise Plaintiff that if he made payment that payment would restart the expired statute of limitations for the Subject Debt were deceptive methods of collection because the Collection Letter was designed to induce Plaintiff to make a payment so as to revive the statute of limitations on a debt that could not be legally enforced at the time the letter was mailed to Plaintiff.

160.    Alternatively, the Collection Letter used contradictory and confusing language to induce Plaintiff into paying a debt that cannot be legally enforced. In particular, by failing to use

the words "we cannot sue you", Defendants intended to contradict and/or confuse Plaintiff as to his legal rights relative to a time-barred debt.

161.    Defendants violated 15 U.S.C. §§ 1692e, 1692e(2) and 1692e(10) by failing to make clear that Plaintiff cannot be sued on the Subject Debt led Plaintiff to believe that he could be sued on the Subject Debt.

162.    Defendants violated 15 U.S.C. §§ 1692e, 1692e(2) and 1692e(10) by failing to disclose that even a partial payment or promise to pay restarts the relevant statute of limitations.

163.    Defendants violated 15 U.S.C. §§ 1692e, 1692e(2) and 1692e(10) by advising Plaintiff that he had a payment deadline 30 days after the receipt of the Collection Letter.

164.    Defendants referenced this payment deadline in an effort to induce Plaintiff to make a payment in order to revive the expired statute of limitations.

165.    Pursuant to 15 U.S.C. § 1692k, Plaintiff is entitled to statutory damages, attorney's fees and costs.

WHEREFORE, Plaintiff AARON GOODMAN respectfully requests that this Honorable Court enter judgment in his favor and against Defendant as follows:

      a.    Declaring that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

      b.    Awarding Plaintiff statutory and/or actual damages in an amount to be determined at trial, for the underlying FDCPA violations;

      c.    Awarding Plaintiff costs and reasonable attorney's fees as provided under 15 U.S.C. §1692k;  and

      d.    Awarding any other relief as this Honorable Court deems just and appropriate.

**COUNT II – VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT**

**(CLASS ACTION BASED CLAIM S AGAINST DEFENDANTS)**

166.    Plaintiff repeats and realleges all of the above allegations as though fully set forth herein.

167.    This Count is brought to seek class action based relief for residents of the State of Colorado.

168.    As set forth above, the subject Collection Letter violates 15 U.S.C. §§ 1692e, 1692e(2) and 1692e(10).

169.    In summary, the Collection Letter utilized false, deceptive, misleading, unfair and unconscionable means to attempt to collect the alleged debt by (a) failing to disclose that Defendants cannot sue to collect the alleged debt, (b) failing to disclose that even a partial payment or promise to pay restarts the relevant statute of limitations and (c) advising Plaintiff that he had a payment deadline 30 days later.

170.    Pursuant to 15 U.S.C. § 1692k, the proposed class members are entitled to actual damages, statutory damages, attorneys' fees and costs.

171.    Plaintiff brings this Count on behalf of the following putative Class:

> All persons with Colorado addresses to whom Asset Acceptance, LLC sent, from a letter containing the following statement: "The law limits how long you can be sued on a debt. Because of the age of your debt, we will not sue you for it, we will not report it to any credit reporting agency, and payment or non-payment will not affect your credit score" where the letter was sent one year prior to the filing of this civil action or where the letter was sent one year prior to June 1, 2018.

172.    The Class is so numerous that joinder of all individual members in one action would be impracticable, given the expected Class size and modest value of individual claims.

173.    On information and belief, over 40 persons received the same letter during this time period.

174.    Excluded from the Class are: (a) Defendants, their agents, subsidiaries, parents, successors, predecessors, and any entity in which those parties, or their parents have a controlling interest, and those entities' current and former employees, officers, and directors; (b) the Judge to whom this case is assigned and the Judge's immediate family; (c) any person who executes and files a timely request for exclusion from the Class; (d) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (e) the legal representatives, successors and assigns of any such excluded person.

175.    There are common questions of law and fact affecting members of the Class, which common questions predominate over questions that may affect individual members.

176.    These common questions include, but are not limited to:

a.    Whether Defendants mailed form letters to persons within the state of Illinois seeking to collect alleged time-barred debt without disclosing that Defendants could not sue to collect the alleged debt;

b.    Whether Defendants mailed form letters to persons within the state of Illinois seeking to collect alleged time-barred debt without disclosing that if alleged debtors made any payment toward the alleged debt, they would revive the legal ability to be sued on the alleged debt;

c.    Whether Defendants mailed form letters to persons within the state of Illinois seeking to collect alleged time-barred debt without disclosing that alleged debtors had the option of not paying anything toward the alleged debt without any legal repercussions; and

d.    Whether Defendants sending of the form letters violated the FDCPA as set forth above.

177.   Plaintiff will fairly and adequately represent the Class members.

178.   Plaintiff has no interests that conflict with the interests of Class members.

179.   Plaintiff has retained counsel experienced in handling consumer class actions.

180.   In particular, Plaintiff's lead attorney (James C. Vlahakis) is an experienced consumer class action litigator who has defended over a hundred consumer-based claims.

181.   Mr. Vlahakis began defending consumer class actions in 1998 and continued to do so as a defense attorney through 2017.

182.   Mr. Vlahakis has litigated over a hundred consumer-based causes of actions, including, but no limited to dozens of FDCPA based putative class actions.

183.   Mr. Vlahakis has also litigated dozens of putative class actions brought pursuant to the Telephone Consumer Protection Act ("TCPA") in both federal and state court.

184.   In conjunction with counsel for the class members, Mr. Vlahakis has obtained Court approval of FDCPA and TCPA class class-bases settlements.  *See, e.g., In Re Capital One Telephone Consumer Protection Act Litigation*, 2012-cv-10064 (N.D. Ill.) ($75 million dollar ATDS based settlement); *Prater v. Medicredit, Inc.*, 2014-cv-0159 ($6.3 million dollar ATDS wrong party settlement); *INSPE Associates v. CSL Biotherapries, Inc*. (N.D. Ill.) ($3.5 million fax based settlement).

185.   Mr. Vlahakis has litigated and defeated TCPA based class certification motions. *See, e.g.,  Jamison v. First Credit Services, Inc.* 290 F.R.D. 92 (N.D. Ill. Mar. 28, 2013), reconsideration denied, 2013 U.S. Dist. LEXIS 105352 (N.D. Ill. July 29, 2013).  *See also*, *Pesce v. First Credit Services, Inc.*, 2012 U.S. Dist. LEXIS 188745 (N.D. Ill. June 6, 2012).

186.    Plaintiff's other counsel are highly competent and experienced consumer rights attorneys.

187.    Neither Plaintiff nor his counsel has any interests that might cause them not to pursue these claims vigorously.

188.    This action should be maintained as a class action because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members that would establish incompatible standards of conduct for the parties opposing the Class.

189.    Plaintiff's claims are typical of the claims of the proposed class members, claims all arise from the same operative facts and are based on the same legal causes of action.

190.    Common questions predominate over any potential individual issues.

191.    Common questions of proof predominate over any potential individual issues.

192.    A class action is an appropriate method for the fair and efficient adjudication of this controversy, and superior to other available methods for the fair and efficient adjudication of this controversy.

193.    Injunctive relief in the form of disgorgement of unlawful payments received by Defendants can be accomplished on a classwide basis.

194.    The likelihood that individual Class members will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, as well as the absence of a fee shifting mechanism.

WHEREFORE, Plaintiff, AARON GOODMAN, respectfully requests that this Honorable Court enter judgment in his favor and in favor of a putative class, and against Defendants, as follows:

a. declaring that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

b. awarding statutory and actual damages, in an amount to be determined at trial, for the underlying violations;

c. in particular, disgorge and return any illegally obtained payments from class members;

d. awarding Plaintiff costs and reasonable attorney's fees; and

e. awarding any other relief as this Honorable Court deems just and appropriate.

**Plaintiff demands trial by jury.**

Respectfully Submitted,

/s/James C. Vlahakis
**James C. Vlahakis**
Sulaiman Law Group, Ltd.
2500 South Highland Avenue, Suite 200
Lombard, IL 60148
(630) 575-8181
jvlahakis@sulaimanlaw.com
*Attorney for Plaintiff*

/s/ Omar T. Sulaiman
**Omar T. Sulaiman**
Sulaiman Law Group, Ltd.
2500 South Highland Avenue, Suite 200
Lombard, IL 60148
(630) 575-8181
osulaiman@sulaimanlaw.com
*Attorney for Plaintiff*

/s/ Mohammed O.  Badwan
**Mohammed O. Badwan**
Sulaiman Law Group, Ltd
2500 South Highland Avenue, Suite 200
Lombard, IL 60148
(630) 575-8181
mbadwan@sulaimanlaw.com
*Attorney for Plaintiff*